Denise GILLILAND, Plaintiff,

v.

NOVARTIS PHARMACEUTICALS
CORPORATION, Defendant.

No. 1:12–cv–00029.

United States District Court,
S.D. Iowa,
Western Division.

Signed July 25, 2014.

Cheryl P. Robertson, John A. Girardi, Molly B. Weber–Girardi Girardi Keese, Los Angeles, CA, J. Barton Goplerud, Hudson Mallaney Shindler & Anderson PC, West Des Moines, IA, for Plaintiff.

Ross W. Johnson, Faegre Baker Daniels, LLP, Des Moines, IA, Christine R.M. Kain, Faegre Baker Daniels LLP, Minneapolis, MN, Donald W. Fowler, James M. Sullivan, John Michael Kalas, Katharine R. Latimer, Peter J. Skalaban, Jr., Hollingsworth LLP, Washington, DC, for Defendant.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court are the following two motions by Novartis Pharmaceuticals Corporation ("Novartis"), both filed May 15, 2014: (1) Motion to Exclude Testimony of Dr. Eric Sung, D.D.S. ("Dr. Sung") ("Motion to Exclude") (Clerk's No. 79)[1]; and (2) Motion for Summary Judgment (Clerk's No. 83)[2] (collectively "Novartis's

1. Novartis requests an oral argument and an evidentiary hearing on its Motion to Exclude. *See* Clerk's No. 79 at 2. Novartis's request for an oral argument is denied based on the Court's conclusion that an oral argument would not substantially aid it in ruling on this Motion. *See* LR 7(c). The Court also concludes that an evidentiary hearing is not necessary because the parties have had ample opportunity to present their respective arguments regarding the admissibility of Dr. Sung's testimony. *See Group Health Plan, Inc. v. Philip Morris USA, Inc.,* 344 F.3d 753, 761 n. 3 (8th Cir.2003) ("Although in limine hearings are generally recommended prior to *Daubert* determinations, ... they are not required.... The only legal requirement is that the parties have an adequate opportunity to be heard before the district court makes its decision." (internal citations and quotation marks omitted)). Indeed, in addition to their voluminous submissions on this issue, the parties were also allowed to further press their respective positions in supplemental filings. *See* Clerk's Nos. 104, 108. Therefore, the parties have had "an adequate opportunity" to be heard on the *Daubert* matter. *See Group Health Plan, Inc.,* 344 F.3d at 761 n. 3.

2. Novartis requests an oral argument on its Motion for Summary Judgment. *See* Clerk's No. 83 at 3. Because the Court has determined that an oral argument would not sub-

Motions"). Denise Gilliland ("Gilliland") responded to each Motion on June 16, 2014. Clerk's Nos. 88, 93. Novartis replied on June 30, 2014. Clerk's Nos. 100, 102. On July 3, 2014, Novartis filed a Notice of Supplemental Authorities in Support of Its Motion for Summary Judgement, Motion to Exclude, and Motion to Exclude Testimony of Plaintiff's Non–Retained Experts ("Notice of Supplemental Authorities"). Clerk's No. 104. Gilliland responded to Novartis's Notice of Supplemental Authorities on July 10, 2014. Clerk's No. 108. The Motions are fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND [3]

On June 17, 2005, Gilliland was diagnosed with multiple myeloma. As a part of her treatment regimen, she received Zometa infusions from July 1, 2005 until May 1, 2009, when she independently decided to discontinue her Zometa treatment. She was not seen by a dentist prior to receiving her first dose of Zometa. On February 7, 2006, Gilliland underwent a stem cell transplant. On the advice of the physician who performed the transplant, she saw a dentist on January 10, 2006, prior to undergoing the transplant. On April 15, 2010, Dr. Valmont Desa, an oral surgeon, diagnosed Gilliland with osteonecrosis of the jaw ("ONJ").

On April 16, 2012, Gilliland filed this lawsuit in the United States District Court for the Central District of California, asserting the following five claims: (1) strict liability; (2) negligent manufacture; (3) negligent failure to warn; (4) breach of express warranty; and (5) breach of im-

plied warranty. *See* Compl. (Clerk's No. 1) ¶¶ 20–49. On October 24, 2012, however, the case was transferred to this Court pursuant to the parties' stipulation. *See* Clerk's Nos. 10–11. The primary dispute in this lawsuit centers on whether Gilliland's oncologists were aware of the association between bisphosphonates [4] and the risk of ONJ at the time they recommended and prescribed the Zometa treatment to her.

## II. STANDARDS OF REVIEW

### A. Daubert *Motions*

Novartis's Motion to Exclude calls upon the Court to assume its role as the evidentiary "gatekeeper" and to determine whether to admit the testimony of Dr. Sung, one of Gilliland's proffered expert witnesses. Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the produce of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the United States Supreme Court explained that when trial courts are faced with a proffer of expert scientific testimony, the Court must determine at

---

stantially aid it in ruling on this Motion, *see* LR 7(c), Novartis's request is denied.

**3.** The Court finds that its ruling on Novartis's Motions will not benefit from a detailed recitation of the facts in this case. If specific

facts become critical to the Court's analysis, they will be set forth in Section III below.

**4.** Zometa belongs to a class of medications known as bisphosphonates.

the outset "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of 'fact to understand or determine a fact in issue." 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Making such a determination "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. In *Kumho Tire Co. v. Carmichael*, the Supreme Court expanded the general holding of *Daubert*, which established the district court's role as a gatekeeper, to include all expert testimony based on technical or scientific knowledge. 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

 Under the *Daubert* test, the Court's task is to "ensure that any and all scientific evidence is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. The Court must, therefore, perform a two-step inquiry into the reliability and relevance of the proffered expert testimony. Under the first prong of the test, reliability, the Court must determine whether the expert testimony is based on scientific knowledge and derived from, and validated by, the scientific method. *Id.* at 590, 113 S.Ct. 2786. To aid the trial court in making this determination, the *Daubert* Court listed four potentially relevant factors, but the Court stressed that it was not setting forth a definitive checklist or test.

*Id.* at 593, 113 S.Ct. 2786. The identified factors include: (1) whether the theory or technique "can be (or has been) tested"; (2) "whether the theory or technique has been subjected to peer review and publication"; (3) the "known or potential rate of error"; and (4) whether the theory or technique has gained general acceptance within the scientific community. *Id.* at 593–95, 113 S.Ct. 2786.

### B. *Summary Judgment Motions*

The term "summary judgment" is something of a misnomer. *See* D. Brock Hornby, *Summary Judgment Without Illusions*, 13 Green Bag 2d 273 (Spring 2010). It "suggests a judicial process that is simple, abbreviated, and inexpensive," while in reality, the process is complicated, time-consuming, and expensive.[5] *Id.* at 273, 281. The complexity of the process, however, reflects the "complexity of law and life." *Id.* at 281. "Since the constitutional right to jury trial is at stake," judges must engage in a "paper-intensive and often tedious" process to "assiduously avoid deciding disputed facts or inferences" in a quest to determine whether a record contains genuine factual disputes that necessitate a trial. *Id.* at 281–82. Despite the seeming inaptness of the name, and the desire for some in the plaintiffs' bar to be rid of it, the summary judgment process is well-accepted and appears "here to stay."[6] *Id.* at 281. Indeed, "judges are duty-bound to

---

**5.** Indeed, Judge Hornby, a District Court judge for the District of Maine, convincingly suggests that the name "summary judgment" should be changed to "motion for judgment without trial." 13 Green Bag 2d at 284.

**6.** Judge Hornby notes that over seventy years of Supreme Court jurisprudence gives no hint that the summary judgment process is unconstitutional under the Seventh Amendment. *Id.* at 281 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 336, 99 S.Ct. 645, 58

L.Ed.2d 552 (1979) and *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). While he recognizes that not much can be done to reduce the complexity of the summary judgment process, he nonetheless makes a strong case for improvements in it, including, amongst other things, improved terminology and expectations and increased pre-summary judgment court involvement. *See id.* at 283–88.

resolve legal disputes, no matter how close the call." *Id.* at 287.

Federal Rule of Civil Procedure 56(a) provides that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought." "[S]ummary judgment is an extreme remedy, and one which is not to be granted unless the movant has established his right to a judgment with such clarity as to leave no room for controversy and that the other party is not entitled to recover under any discernible circumstances." *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 209 (8th Cir. 1976) (citing *Windsor v. Bethesda Gen. Hosp.,* 523 F.2d 891, 893 n. 5 (8th Cir. 1975)). The purpose of summary judgment is not "to cut litigants off from their right of trial by jury if they really have issues to try." *Poller v. Columbia Broad. Sys., Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962) (quoting *Sartor v. Ark. Natural Gas Corp.,* 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). Rather, it is designed to avoid "useless, expensive and time-consuming trials where there is actually no genuine, factual issue remaining to be tried." *Anderson v. Viking Pump Div., Houdaille Indus., Inc.,* 545 F.2d 1127, 1129 (8th Cir.1976) (citing *Lyons v. Bd. of Educ.,* 523 F.2d 340, 347 (8th Cir.1975)). Summary judgment can be entered against a party if that party fails to make a showing sufficient to establish the existence of an element essential to its case, and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Federal Rule of Civil Procedure 56 mandates the entry of summary judgment upon motion after there has been adequate time for discovery. Summary judgment is appropriately granted when the record, viewed in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences, shows that there is no genuine issue of material fact, and that the moving party is therefore entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Harlston v. McDonnell Douglas Corp.,* 37 F.3d 379, 382 (8th Cir.1994). The Court does not weigh the evidence, nor does it make credibility determinations. The Court only determines whether there are any disputed issues and, if so, whether those issues are both genuine and material. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wilson v. Myers,* 823 F.2d 253, 256 (8th Cir.1987) ("Summary judgment is not designed to weed out dubious claims, but to eliminate those claims with no basis in material fact.") (citing *Weight Watchers of Quebec, Ltd. v. Weight Watchers Int'l, Inc.,* 398 F.Supp. 1047, 1055 (E.D.N.Y. 1975)).

In a summary judgment motion, the moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact based on the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. If the moving party has carried its burden, the nonmoving party must then go beyond its original pleadings and designate specific facts showing that there remains a genuine issue of material fact that needs to be resolved by a trial. *See* Fed.R.Civ.P. 56(c). This additional showing can be by affidavits, depositions, answers to interrogatories, or the admissions on file. *Id.; Celotex,* 477 U.S. at 322–23, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat a motion for summary judgment; the requirement is that

there be no *genuine* issue of *material fact.*" *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is "genuine" if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party. *See id.* at 248, 106 S.Ct. 2505. "As to materiality, the substantive law will identify which facts are material.... Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

Courts do not treat summary judgment as if it were a paper trial. Therefore, a "district court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In a motion for summary judgment, the Court's job is only to decide, based on the evidentiary record that accompanies the moving and resistance filings of the parties, whether there really is any material dispute of fact that still requires a trial. *See id.* (citing *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 & 10 Wright & Miller, *Federal Practice & Procedure* § 2712 (3d ed.1998)).

## III. ANALYSIS

Novartis moves for summary judgment on all of Gilliland's claims, advancing a two-part argument. First, Novartis contends that summary judgment on all of Gilliland's claims is proper because she cannot, as a matter of law, generate a jury question as to specific causation, i.e., that Gilliland's Zometa infusions caused her ONJ. Def.'s Mem. in Supp. of Its Mot. for Summ. J. ("Def.'s SJ Br.") (Clerk's No. 84) at 12. Second, in the event that its specific causation argument fails, Novartis contends that it is nevertheless entitled to summary judgment on Gilliland's failure to warn, negligent manufacture, and breach of express warranty claims.[7] *See id.* at 13–19. In particular, Novartis maintains that Gilliland's failure to warn claim must fail because the warning provided was adequate as a matter of law and because there can be no genuine factual dispute as to whether a different "warning would have prevented ... [Gilliland] from developing ONJ." *See id.* at 13–17. As for Gilliland's negligent manufacture cause of action, Novartis argues that she has not presented any evidence sufficient to raise a triable issue of fact regarding whether the specific Zometa infusions that Gilliland received deviated from the medication's intended design. *See id.* at 17–18. Finally, Novartis contends that the breach of express warranty claim fails because Gilliland cannot, as a matter of law, demonstrate that Novartis made any affirmations to her or that she relied on such affirmations. *See id.* at 18–19.

### A. *Specific Causation*

■ The parties agree that to generate a jury question on this issue, the testimony of Dr. Sung, Gilliland's only designated specific causation expert, must be admissible. *Compare* Def.'s SJ Br. at 12–13 *with generally* Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s SJ Resistance Br.") (Clerk's No. 93) & Pl.'s Opp'n to Def.'s Mot. to Exclude ("Pl.'s *Daubert* Resistance Br."). Thus, the success of Novartis's Motion for Summary Judgment—to the extent it is based on the asserted lack of specific causation—depends solely on the success of its Motion to Exclude. Novartis raises the following three challenges to the admissibility of Dr. Sung's testimony: (1) he lacks the necessary expertise to render a reliable differential di-

---

**7.** Novartis does not mount any additional challenges to Gilliland's strict liability and

breach of implied warranty claims.

agnosis[8] by ruling out other possible causes of Gilliland's ONJ because he is not an expert on osteomyelitis, which is the main alternate cause of her ONJ; (2) his differential diagnosis is unreliable because he did not rule out osteomyelitis, chronic sinusitis, and maxillary drainage as possible causes of Gilliland's ONJ; (3) to the extent he ruled out these other potential causes, his stated rationale for doing so is "unduly conclusory."[9] Def.'s Mem. in Supp. of Mot. to Exclude ("Def.'s *Daubert* Br.") (Clerk's No. 79–1) at 8–12. Although Novartis challenges Dr. Sung's testimony on these three purportedly separate

grounds, its arguments boil down to the assertion that he did not conduct a proper differential diagnosis. Gilliland disagrees, arguing that Dr. Sung is qualified to and did in fact perform a sound differential diagnosis by, *inter alia,* excluding osteomyelitis, chronic sinusitis, and maxillary drainage as possible causes of her ONJ. Pl.'s *Daubert* Resistance Br. at 8–14.

■ For reasons that follow, the Court concludes that Dr. Sung completed a scientifically sound differential diagnosis, and, accordingly, is not precluded from testifying that Gilliland's Zometa treatment caused her ONJ.[10] See *Glastetter v. Novar-*

---

**8.** Performing a differential diagnosis is the process whereby

> a physician begins by "ruling in" all scientifically plausible causes of the plaintiff's injury, . . . then "rules out" the least plausible causes of injury until the most likely cause remains. The final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury.

*Glastetter v. Novartis Pharms. Corp.,* 252 F.3d 986, 989 (8th Cir.2001) (internal citation omitted).

**9.** Novartis also moves to exclude Dr. Sung's opinion that "[t]he cumulative dose or duration of Zometa augments [his] opinion as to cause, as the incidence and severity of [ ]ONJ is related to time on bisphosphonate." *See* Def.'s *Daubert* Br. at 14. Novartis argues that this opinion is unreliable and conclusory because Dr. Sung's asserted bases for such opinion were common knowledge, a study involving the medication Fosamax, and his clinical experience. *See id.* The Court agrees that lacking from Dr. Sung's opinion is "any data to support . . . [its] reliability . . . , as he only vaguely referenced potential sources of information on which he based this opinion during his deposition, and there is no indication that he used any methodology in reaching this conclusion." *See Stanley v. Novartis Pharms. Corp.,* No. CV 11–03191, 11 F.Supp.3d 987, 1002, 2014 WL 1316217, at *10 (C.D.Cal. Apr. 2, 2014) (internal citation omitted) (excluding an identical opinion by Dr. Sung on the relationship between bisphosphonate dosing and the incidence and severity of ONJ).

Gilliland insists, however, that Dr. Sung's opinion regarding the relationship between bisphosphonate dosing and the incidence and severity of ONJ is admissible because it is based on the American Association of Oral and Maxillofacial Surgeons Position Paper ("Position Paper"), which reports there are studies suggesting that such a relationship exists. *See* Pl.'s *Daubert* Resistance Br. at 15; Pl.'s App. in Supp. of Her Opp'n to Def.'s Mot. to Exclude ("Pl.'s *Daubert* App.") (Clerk's No. 88–6) at 5 ("Recent studies have suggested that manipulation of . . . bisphosphonate dosing might be effective in . . . minimizing [ ]ONJ risk."). To the extent Dr. Sung intends to opine, based on his personal observations, that there is a relationship between bisphosphonate dosing and ONJ, he is precluded from doing so because he has not shown that he used any methodology in reaching such conclusion. Dr. Sung may, however, testify as to the contents of the Position Paper and read passages from it into the record. *See United States v. Hawley,* 592 F.Supp. 1186, 1191 (D.S.D.1984) ("[D]ocuments governed by [Federal Rule of Evidence] 803(18) are not admissible as exhibits to go to the jury but the expert or other witnesses may testify as to these documents and read passages from them.").

**10.** The Court concludes that Dr. Sung has the requisite experience and knowledge to render a reliable opinion as to the cause of Gilliland's ONJ. Indeed, it is undisputed that Dr. Sung has not only treated multiple patients with ONJ, but has also authored publications and delivered presentations on bisphospho-

*tis Pharms. Corp.,* 252 F.3d 986, 989 (8th Cir.2001) ("Because a differential diagnosis is presumptively admissible, a district court may exercise its gatekeeping function to exclude only those diagnoses that are scientifically invalid." (internal citation omitted)). Indeed, there is no doubt that despite Novartis's assertion to the contrary, Dr. Sung considered but rejected the possibility that Gilliland's osteomyelitis, chronic sinusitis, and maxillary drainage caused her ONJ. Pl.'s *Daubert* App. (Clerk's No. 88–3) at 35–36 (Dr. Sung Dep. at 136:11–138:21) (Dr. Sung explaining why he ruled out osteomyelitis, chronic sinusitis, and maxillary drainage as potential causes of Gilliland's ONJ). True, Dr. Sung's expert report makes no mention of osteomyelitis, chronic sinusitis, or maxillary drainage, *see generally id.* (Clerk's No. 88–9) ¶¶ 12–25, but, during his deposition, he was explicitly asked whether it was plausible that one of those conditions had caused Gilliland's ONJ, and he answered in the negative. Moreover, even assuming that Dr. Sung could offer no cogent explanation for ruling out osteomyelitis, chronic sinusitis, and maxillary drainage as potential causes of Gilliland's ONJ, his testimony would still be admissible because Eighth Circuit precedent does not require the exclusion of expert testimony merely because the expert has not ruled out every possible alternative cause for the plaintiff's medical condition.[11] *See Lauzon v. Senco Prods.,* 270 F.3d 681, 693–94 (8th Cir.2001) ("Another factor commonly applied to the determination of admissibility of an expert opinion is the ability to rule out other possibilities. Yet, this requirement cannot be carried to a quixotic extreme .... *[A]n expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause ....* The doctor's explanations as to conclusions not ruled out went to weight and not admissibility." (emphasis added) (internal citations omitted)); *see also Wilson v. TASER Int'l, Inc.,* 303 Fed.Appx. 708, 714 (11th Cir. 2008) ("[A] medical expert need not rule out every possible alternative in order to form an opinion on causation....."); *Goebel v. Denver & Rio Grande W. R.R.,* 346 F.3d 987, 999 (10th Cir.2003) (affirming the district court's conclusion that the medical expert's differential diagnosis was reliable because, *inter alia,* "he adequately considered and ruled out some alternative explanations [for the plaintiff's medical condition] even if he did not explicitly rule out depression"); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 265 (4th Cir.1999) ("[A] medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alter-

nate-related ONJ and dental management of cancer patients. *See* Pl.'s *Daubert* App. (Clerk's No. 88–2) at 8–10, 11; *id.* (Clerk's No. 88–9) ¶¶ 3, 5–7. Novartis, however, objects to the admissibility of Dr. Sung's testimony, pointing out that by his own admission, he is not an expert on osteomyelitis, and is, therefore, not qualified to reliably rule out Gilliland's osteomyelitis as a potential cause of her ONJ. *See* Def.'s *Daubert* Br. at 8. The Court is not persuaded that this is a sufficient basis for excluding Dr. Sung's testimony. Indeed, Novartis has not cited any legal authority—nor has the Court found any—requiring that experts testifying as to medical causation be experts in every possible cause of the dis-

ease or condition at issue. *See Stanley,* 11 F.Supp.3d at 1000, 2014 WL 1316217, at *8 ("[T]he Court is not aware of a requirement that an expert testifying as to medical causation must be an expert in every possible cause of a condition.").

**11.** Of course, this lawsuit presents an even stronger case for allowing Dr. Sung's testimony because he actually provided cogent reasons—albeit in response to questions during his deposition rather than in his expert report—for excluding osteomyelitis, chronic sinusitis, and maxillary drainage as possible causes of Gilliland's ONJ.

native cause of a plaintiff's illness. The alternative causes suggested by a defendant affect the weight that the jury should give the expert's testimony and not the admissibility of that testimony, unless the expert can offer no explanation for why she has concluded [an alternative cause offered by the opposing party] was not the sole cause." (internal citations and quotation marks omitted) (alteration in original)); *Heller v. Shaw Indus., Inc.,* 167 F.3d 146, 156 (3d Cir.1999) ("A medical expert's causation conclusion should not be excluded because he or she has failed to rule out every possible alternative cause of a plaintiff's illness.").

Furthermore, contrary to Novartis's assertion, Dr. Sung's reasoning in rejecting osteomyelitis, chronic sinusitis, and maxillary drainage as possible causes of Gilliland's ONJ is not *ipse dixit. See* Def.'s *Daubert* Br. at 10–11. His decision was based on his knowledge and experience with ONJ and his review of Gilliland's medical and dental histories. *See* Pl.'s *Daubert* App. (Clerk's No. 88–9) ¶¶ 3, 5–7, 11. In essence, Novartis's challenge to the soundness of Dr. Sung's differential diagnosis amounts to an argument that he should have done more testing and more thorough patient evaluations before concluding that Gilliland's ONJ was caused by her Zometa treatment. *See* Def.'s *Daubert* Br. at 11 (pointing out that Dr. Sung did not examine Gilliland or "perform[ ] any tests on her, ... did not rely upon any of her dental x-rays in forming his opinions ..., [and did] [n]o biopsy testing, culture testing, or other testing of the alleged ONJ ... to evaluate for osteomyelitis"). Such arguments, however, go to the weight of the challenged testimony, not its admissibility. *See Kudabeck v. Kroger Co.,* 338 F.3d 856, 861 (8th Cir.2003) ("Kroger's attacks regarding the completeness of Dr. Reilly's methodology go to the weight and not the admissibility of his testimony." (internal citation omitted)). Thus, Novartis's "remedy is not exclusion, but instead cross-examination, the presentation of contrary evidence, and careful instruction on the burden of proof." [12] *See Martin v. Apex Tool Group, L.L.C.,* 961 F.Supp.2d 954, 961 (N.D.Iowa 2013) (internal citation omitted).

### B. *Failure to Warn* [13]

Novartis seeks summary judgment on Gilliland's failure to warn claim, advanc-

---

[12]. In the event that the Court finds Dr. Sung's specific causation opinion admissible, Novartis argues that he should nevertheless be precluded from testifying that Gilliland's Zometa treatment caused her maxillary jaw problems. *See* Def.'s *Daubert* Br. at 12–14. In particular, Novartis claims that, by his own admission, Dr. Sung knew of no scientifically reliable way to exclude the possibility that Gilliland's "draining infection" caused her exposed bone in her maxilla. *See id.* Therefore, Novartis argues that Dr. Sung's opinion that Gilliland "developed ONJ from Zometa ... should be limited to the exposed bone in her mandible." *Id.* at 14. Gilliland resists Novartis's argument, pointing out that Dr. Sung actually concluded that her "maxillary drainage" could not have led to the exposed bone in her maxilla. *See* Pl.'s *Daubert* Resistance Br. at 14. Because the Court finds that Dr. Sung possesses the necessary expertise to render such an opinion and because he used a methodology in reaching his conclusion, his opinion as to the causation between Gilliland's Zometa treatment and the exposed bone in her maxilla is admissible. Novartis's objections to the testimony at issue go to its weight, not its admissibility.

[13]. In its summary judgment brief, Novartis refers to failure to warn *claims*, presumably because it posits that a warning defect may give rise to both a strict liability claim and a negligence claim. *See* Def.'s SJ Br. at 13–14 (emphasis added). Under Iowa law, however, "[f]ailure to warn claims cannot be brought under a theory of strict liability." *Nationwide Agribusiness Ins. Co. v. SMA Elevator Constr.,* 816 F.Supp.2d 631, 653 (N.D.Iowa 2011) (internal citation omitted).

ing a two-fold argument. First, Novartis claims that, at the time Gilliland was prescribed Zometa, the risk of ONJ had been adequately disclosed, and, therefore, no reasonable jury could conclude that Novartis's warning was defective in that regard. *See* Def.'s SJ Br. at 13–14. Second, Novartis maintains that Gilliland's failure to warn claim should fail because she cannot, as a matter of law, demonstrate that the alleged warning defect caused her ONJ, i.e., "[she] has no evidence that different warnings regarding Zometa would have prevented ... [her] from developing ONJ." *Id.* at 14 (capitalization modified from original).

1. *Adequate disclosure of the risk of ONJ.*

█ To survive summary judgment, Gilliland must demonstrate a genuine fact issue as to whether Novartis adequately warned her oncologists—*not her*—of the connection between bisphosphonates and the risk of ONJ. *See Daughetee v. Chr. Hansen, Inc.,* 960 F.Supp.2d 849, 870 (N.D.Iowa 2013) (explaining that the "intermediary defense is still viable under Iowa law" and that a seller of a product can escape liability on a failure to warn claim if the seller shows that it adequately warned an intermediary that, in turn, has a duty to warn the end user (internal citations and quotation marks omitted)); *see also In re Aredia & Zometa Prods. Liab. Litig.,* No. 3:06–MD–1760, 2009 WL 8638121, at *1 (M.D.Tenn. Aug. 13, 2009)

("Under the learned intermediary doctrine, manufacturers of prescription drugs escape liability for failure to instruct and warn consumers so long as they adequately instruct and warn physicians responsible for prescribing the medication." (internal citation omitted)); Restatement (Third) of Torts: Products Liability ("Third Products Restatement") § 6 cmt. d ("The traditional rule, often referred to as the 'learned intermediary rule,' holds that manufacturers of prescription drugs discharge their duty of care to patients by warning the healthcare providers who prescribe and use the drugs to treat them."). Novartis argues that by July 1, 2005—when Zometa was first prescribed to Gilliland—the association between ONJ and bisphosphonates was widely recognized in the medical community and known to her oncologists. *See* Def.'s SJ Br. at 13–14. Therefore, Novartis asserts that, as a matter of law, it cannot face liability for its alleged failure to warn of the risk of ONJ. *See id.* Gilliland resists, contending that there is a jury question regarding whether Novartis adequately warned her oncologists of such risk. *See* Pl.'s SJ Resistance Br. at 13–16. The Court agrees with Gilliland. Drs. Samer Renno ("Dr. Renno")[14] and Joseph Verdirame ("Dr. Verdirame"), two of Gilliland's oncologists[15] who prescribed Zometa to her, testified that they could not recall when they first became aware of the association between Zometa and the risk of ONJ.[16] *See* Pl.'s SJ App. at 183 (Dr.

---

Accordingly, the Court's analysis relates solely to Gilliland's negligent failure to warn claim.

**14.** Dr. Renno was the first oncologist to prescribe Zometa to Gilliland. *See* Def.'s Resp. to Pl.'s Statement of Additional Materials Facts (Clerk's No. 102–1) at 16–17 (admitting that Dr. Renno was the first physician to prescribe Zometa).

**15.** Gilliland was also treated by Drs. Abraham Mathews and Inaganti Shah.

**16.** Novartis points out, however, that Drs. Renno and Verdirame were certainly aware of the association between bisphosphonates and the risk of ONJ prior to July 1, 2005 (when Gilliland was first prescribed Zometa) because in September 2004, Novartis mailed out copies of its "Dear Doctor" letter advising of the risk of ONJ to both of them. *See* Def.'s Resp. to Pl.'s Statement of Additional Materials Facts (Clerk's No. 102–1) at 17; Pl.'s Suppl. App. in Supp. of Its Mot. for Summ.

Renno Dep. at 43:17–25), 191 (Dr. Verdirame Dep. at 36:2–15). Dr. Verdirame testified, however, that as soon as such association became known, all the physicians in his practice had a meeting and decided to require that every patient undergo a dental evaluation before starting Zometa infusions. *See id.* at 192 (Dr. Verdirame Dep. at 40:10–24). It is, however, undisputed that Gilliland did not see a dentist before starting her Zometa infusions. Therefore, a reasonable jury could infer that neither Dr. Renno nor Dr. Verdirame was aware of the risk of ONJ when they prescribed Zometa to Gilliland because had they been aware of such risk, they would have required that Gilliland undergo a dental evaluation prior to starting the Zometa therapy, and she would have complied.[17]

### 2. *Causation.*

The gist of Novartis's argument is that Gilliland has presented no evidence that a different warning would have caused her prescribing physicians to alter her recommended course of treatment in such a way that Gilliland's ONJ would have been avoided. *See* Def.'s SJ Br. at 14–15. In support, Novartis highlights the testimony of Gilliland's treating oncologists stating that they would have prescribed Zometa even if Novartis had included a different warning concerning the risk of ONJ because the benefits of Zometa far outweigh

its risks. *Id.* As Gilliland notes, however, Novartis's "focus on the prescribing physician completely ignores the fact that ultimately it is up to *the patient* to decide whether to take a recommended therapy." Pl.'s SJ Resistance Br. at 17. The Court finds this argument persuasive. Prior to deciding whether Gilliland has raised a triable issue of fact as to causation, however, the Court must resolve a threshold issue: whether, under Iowa law, a defendant-drug manufacturer is entitled to a judgment as a matter of law on the causation element of the plaintiff-patient's negligent failure to warn claim if the defendant demonstrates that the plaintiff's doctor would not have changed her prescribing practices even if the defendant had provided a better warning or that any change in the prescribing practices would not have prevented the plaintiff's medical condition.

### a. *The threshold question.*

Novartis espouses—and urges the Court to adopt—the following position shared by many courts throughout the country: that whether the plaintiff-patient would have refused treatment if a better warning had been provided is irrelevant. *See* Def.'s SJ Br. at 15–17 (collecting cases from various jurisdictions for this proposition); Def.'s Reply in Supp. of Its Mot. for Summ. J. (Clerk's No. 102) at 5 (Novartis arguing that Gilliland's assertion she would have refused the Zometa treatment had she been apprised of the associated risks is

---

J. (Clerk's No. 102–2) at 1–2, 4–5, 7. To obtain summary judgment on Gilliland's failure to warn claim, however, Novartis must demonstrate that, viewing the evidence in the light most favorable to Gilliland, no reasonable jury could conclude that Novartis's warning of the risk of ONJ is anything but adequate. Novartis has not shouldered its burden in this respect. A reasonable jury, viewing the contents of the "Dear Doctor" letter in the light most favorable to Gilliland, could conclude that the warning of the risk of ONJ is not adequate because the changes to the package insert dealing with such risk suggest that the

ONJ developed by patients on bisphosphonates may be due to other factors—chemotherapy, corticosteroids, osteomyelitis or other local infection, cancer, poor oral hygiene, anemia, or preexisting oral disease. *See* Pl.'s Suppl. App. in Supp. of Its Mot. for Summ. J. (Clerk's No. 102–2) at 4–5.

17. Notably, some six months later, when Gilliland was asked to undergo a dental evaluation prior to her stem cell transplant, she complied.

irrelevant to the causation issue because all that matters is whether her oncologists would have prescribed Zometa even if they knew of the risk of ONJ). Rather, Novartis claims that summary judgment to the defendant-drug manufacturer is proper so long as the plaintiff-patient's treating physicians testify that even if the defendant-drug manufacturer had provided a better warning, they would not have changed their prescribing practices or if the plaintiff-patient lacks evidence that any change in such prescribing practices would have prevented her disease or condition. *See* Def.'s SJ Br. at 15–17. Although instructive, neither of the cases cited by Novartis in support of this argument is binding on the Court. Indeed, the cases Novartis relies on and urges the Court to follow have effectively endorsed an extension of the learned intermediary rule that pres-

ents an issue of first impression in Iowa. Because the Iowa Supreme Court has yet to make a pronouncement, the Court must predict how Iowa's highest court would resolve this threshold question. *See Gage v. HSM Elec. Prot. Servs.,* 655 F.3d 821, 825 (8th Cir.2011) (internal citations omitted). With this task in mind, the Court turns to analyzing the cases, upon which Novartis relies.

The cases cited by Novartis fall into two categories: (1) those that necessarily rely on the premise that patients generally follow their treating physicians' recommendations [18]; and (2) those that do not appear to involve a statement by the plaintiff that she would have refused the recommended treatment had she been better advised of the associated risks.[19] Because Gilliland states that she would have refused the

---

**18.** *See, e.g., Terhune v. A.H. Robins Co.,* 90 Wash.2d 9, 577 P.2d 975, 978 (1978) ("Where a product is available only on prescription or through the services of a physician, the physician acts as a 'learned intermediary' between the manufacturer or seller and the patient. It is his duty to inform himself of the qualities and characteristics of those products which he prescribes for or administers to or uses on his patients, and to exercise an independent judgment, taking into account his knowledge of the patient as well as the product. *The patient is expected to and, it can be presumed, does place primary reliance upon that judgment.*" (emphasis added)) (relied on by *Luttrell v. Novartis Pharms. Corp.,* 555 Fed.Appx. 710, 711 (9th Cir.2014)); *Payne v. Novartis Pharms. Corp.,* 967 F.Supp.2d 1223, 1234–35 (E.D.Tenn.2013) (granting summary judgment to the defendant on the plaintiff's failure to warn claim because the plaintiff presented no evidence that receiving a dental examination prior to undergoing a bisphosphonate therapy, which is what the plaintiff's treating physician would have required had he been aware of the connection between bisphosphonates and the risk of ONJ at the time he recommended the bisphosphonate therapy to the plaintiff, would have prevented the plaintiff's injury).

**19.** *See, e.g., D'Agnese v. Novartis Pharms. Corp.,* 952 F.Supp.2d 880, 892 (D.Ariz.2013) ("[E]ven after being warned of the possible risk of ONJ, Mr. D'Agnese continued to take Zometa."); *Zimmerman v. Novartis Pharms. Corp.,* 287 F.R.D. 357, 361 (D.Md.2012) ("Plaintiff now relies on two … theories to establish proximate causation: 1) If Ms. Newman's healthcare providers had known of the risk of invasive dental procedures in Aredia patients, she would have had a dental examination prior to starting Aredia and tooth # 16 would have been extracted at that point; or 2) If Dr. Mennitt had known of the risk, he would not have extracted tooth # 16 in 2001 while Ms. Newman was taking Aredia."); *Ingram v. Novartis Pharms. Corp.,* 888 F.Supp.2d 1241, 1245 (W.D.Okla.2012) (the plaintiff arguing that there is a genuine issue of fact as to proximate causation because his treating physician's prescribing practices changed over time to account for the risk of ONJ as opposed to claiming that he would have refused to take bisphosphonates); *Eberhart v. Novartis Pharms. Corp.,* 867 F.Supp.2d 1241, 1254 (N.D.Ga.2011) (the plaintiff arguing that "had she been warned of the connection between Zometa and ONJ she would have refused the extractions of teeth 19 and 20," which caused her ONJ, but not that she would have refused to take Zometa).

Zometa treatment had she known of the risk of ONJ, the latter category of cases is inapposite, and the Court, accordingly, focuses its attention on the first group of cases. Even assuming that the premise upon which those cases rely is sound,[20] the legal effect of such premise should, at most, raise a rebuttable presumption[21] that plaintiff-patients can attempt to overcome. Therefore, assuming that the Iowa Supreme Court would adopt the premise at issue, Iowa's learned intermediary jurisprudence suggests that the State's highest court would conclude that the legal effect of such premise is, at most, to raise a rebuttable presumption. Indeed, to conclude otherwise, i.e., that patients should always be deemed to undergo the treatment therapy recommended by their physicians, regardless of the risks associated with such therapy, would frustrate the purpose of the learned intermediary rule, which is to enable patients to make informed and intelligent decisions whether to undergo a recommended therapy by balancing the probable risks against the probable benefits of the course of treatment proposed by their physicians. *See* Third Products Restatement § 6(d) cmt. b ("The rationale supporting this 'learned intermediary' rule is that only health-care professionals are in a position to understand the significance of the risks involved and to assess the relative advantages and disadvantages of a given form of prescrip-

tion-based therapy. The duty then devolves on the health-care provider to supply to the patient such information as is deemed appropriate under the circumstances so that the patient can make an informed choice as to therapy."). The learned intermediary doctrine certainly does not allow health care professionals to substitute their judgment for that of their patients. Nor does it obviate the need to consider whether the plaintiff-patient's decision concerning her recommended course of treatment would have been different, assuming that the warning at issue had been more adequate. Rather, the "learned intermediary" rule merely recognizes that only health care professionals are able to fully understand and appreciate the risks associated with a given prescription medication. Accordingly, the law makes it their duty to provide to their patients whatever information they deem pertinent so that the patients can make informed decisions.[22] *See* Third Products Restatement § 6(d) cmt. b (stating that health care providers have a duty "to supply to the patient such information as is deemed appropriate under the circumstances so that the patient can make an informed choice as to therapy").

b. *Has Gilliland generated a triable issue of fact as to causation?*

█ Even assuming that a different warning would have had no effect on Gilli-

---

**20.** It certainly defies common sense to argue that this premise is anything but sound. After all, patients see doctors for their unique expertise in diagnosing and treating medical conditions. It is, therefore, axiomatic that *most* patients rely on their doctors' recommendations and comply with the prescribed course of treatment.

**21.** Since no one disputes that it is up to the individual patient to decide whether to undergo a given treatment therapy, the presumption that the patient follows her doctor's recommendations must necessarily be rebuttable.

**22.** The theory of Gilliland's failure to warn claim rests on the assertion that she was denied an opportunity to make an informed decision as to her multiple myeloma treatment therapy because Novartis did not apprise the oncologists who recommended the therapy of the risk of ONJ, and the oncologists, in turn, did not inform her of such risk. As a result of this alleged warning defect, Gilliland asserts that she developed ONJ because, had she known of the relationship between bisphosphonates and the risk of ONJ, she would have rejected the Zometa treatment.

land's oncologists' decision to recommend Zometa infusions as a course of treatment for her multiple myeloma, the record contains sufficient evidence for a reasonable jury to conclude that Gilliland would have rejected the Zometa treatment had she been apprised of the risk of developing ONJ. Indeed, Gilliland testified in her deposition that had she been aware of Zometa's risks, she would have rejected the treatment.[23] *See* Pl.'s SJ App. at 173 (Gilliland Dep. at 69:11–13), 178 (Gilliland Dep. at 121:5–24). The record further supports such inference because Gilliland requested a reduction of her Zometa dose and ultimately decided to discontinue the infusions altogether, *see id.* at 173 (Gilliland Dep. at 69:22–70:5), 175 (Gilliland Dep. at 71:11–25), even though by that time she was aware of Zometa's benefits, having lived more than six months, which is the average life expectancy for patients with multiple myeloma, if left untreated, *see* Pl.'s Resp. to Def.'s Statement of Material Facts (Clerk's No. 93–1) ¶ 3; *see also Sheffer v. Novartis Pharms. Corp.*, No. 3:12–cv–238, 2013 WL 5276558, at *13 (S.D.Ohio Sept. 18, 2013) ("Sheffer testified that even though Dr. Haluschak recommended that she undergo radiation treatment, she opted not to follow his advice because of the potential for liver damage . . . . It can be inferred that, having rejected Dr. Haluschak's advice on that particular matter after being fully informed of the risks, she would have no qualms about doing so again."). Accordingly, the Court finds that a reasonable fact-finder, viewing the evidence in the light most favorable to Gilliland, could conclude that she would have refused the Zometa treatment had she been warned about the risks associated with bisphosphonate therapy, including the possibility of developing ONJ.[24]

---

23. Novartis contends that the Court should reject such testimony because, among other things, it is "hypothetical, . . . [and] self-serving. . . ." *See* Pl.'s Reply in Supp. of Its Mot. for Summ. J. (Clerk's No. 102) at 5. Although there can be no doubt that the testimony at issue is hypothetical and self-serving, so is the testimony by Gilliland's treating oncologists that they would have still prescribed Zometa to her, even if Novartis had provided a better warning of the risk of ONJ. If, as Novartis argues, the testimony of these physicians is relevant, so too must be Gilliland's testimony in question.

24. In so holding, the Court does not reject—or even undermine—the validity of the learned intermediary doctrine under Iowa law. Rather, the Court's conclusion is merely a logical extension of its determination that, if faced with the threshold question discussed above, *see supra* Section III.B.2.a, the Iowa Supreme Court would decline to espouse the interpretation of the learned intermediary rule urged by Novartis. Notably, the Court is not the first tribunal to recognize that deciding whether to reject a recommended treatment therapy is solely within the purview of the patient and, accordingly, a plaintiff-patient could prevail on the causation element of a failure to warn claim if she demonstrates that she would have rejected the recommended therapy had she been warned about the risks associated with the recommended course of treatment. *See Kirchman v. Novartis Pharms. Corp.*, 2014 WL 2158519, at *5, 2014 U.S. Dist. LEXIS 71159, at *14–15 (M.D.Fla. May 23, 2014) ("The Court concludes that genuine issues of material fact exist as to whether the allegedly inadequate warning was a proximate cause of Mr. Kirchman's ONJ. While Dr. Byun testified that a different warning would not have changed his decision to prescribe Aredia and/or Zometa to Mr. Kirchman, Dr. Byun also testified that he now discusses the risk of ONJ with his patients, and did discuss that risk with Mr. Kirchman when recommending that he take Aredia and/or Zometa in 2007 and 2008. Thus, a reasonable juror could find that Dr. Byun, had he been adequately warned, would have changed his prescribing practices by giving different warnings or instructions to Mr. Kirchman in 2002 and 2003. . . . On this record, a reasonable juror could infer that Mr. Kirchman, had he been given different warnings or instructions, would have declined Aredia and/or Zometa in 2002 and 2003." (inter-

## C. *Negligent Manufacture* [25] *and Breach of Express Warranty*

Novartis claims that it is entitled to summary judgment on Gilliland's negligent manufacture claim because she has presented "no evidence that any of the Zometa infusions ... [she] received departed from the design specifications for Zometa." *See* Def.'s SJ Br. at 17 n. 4. As for the breach of express warranty claim, Novartis points out that Gilliland "has offered nothing to show that [Novartis] made any affirmations of fact to her ..., and [t]here is no evidence under this record that [she] read or relied on any of [Novartis's] informational material." *Id.* at 18 (internal citations and quotation marks omitted) (alterations in original). Since Gilliland does not respond to these arguments, *see generally* Pl.'s SJ Resistance Br., Novartis is entitled to summary judgment on her negligent manufacture and breach of express warranty claims. *See* L.R. 56(b)(1) ("A party resisting a motion for summary judgment must ... file contemporaneously ... [a] brief ... in which the resisting party responds to each of the grounds asserted in the motion for summary judgment."); *C. Line, Inc. v. City of Davenport*, 957 F.Supp.2d 1012, 1032 (S.D.Iowa 2013) (granting summary judgment to the defendant on the takings and substantive due process claims where the plaintiff did not resist the defendant's request for summary judgment on those claims).

## D. *Strict Liability*

There are three types of product defects—manufacturing, design, and warning. *See* Third Products Restatement § 2 (adopted by the Iowa Supreme Court in *Wright v. Brooke Group Ltd.*, 652 N.W.2d 159 (Iowa 2002)). Gilliland's strict liability claim asserts that Zometa suffers from all three. *See* Compl. ¶ 25 (alleging that Zometa is "a product unreasonably dangerous for normal use due to its defective design, defective manufacture, and ... [Novartis's] misrepresentations and inade-

---

nal citations omitted)); *Guenther v. Novartis Pharm. Corp.*, 990 F.Supp.2d 1299, 1303 (M.D.Fla.2014) (rejecting Novartis's argument that, under Florida law, to demonstrate proximate cause between the medication's warning defect and the plaintiff-patient's injury, the plaintiff-patient must show that her treating physician would have refused to prescribe the Zometa if the defendant-manufacturer would have provided a better warning of the risk of ONJ); *Smith v. Pfizer, Inc.*, 688 F.Supp.2d 735, 746 (M.D.Tenn.2010) (concluding that "the learned intermediary doctrine does not require dismissal of the plaintiff's claims" because "[f]rom th[e] evidence, the jury could reasonably conclude that ... [the plaintiff] would have stopped taking [the medication] Neurontin if ... [his doctor] had told him ... that he should be alert to the possibility of increased depression or suicidality").

25. Novartis treats Gilliland's negligent manufacture claim as a design defect claim because it "does not believe [that] ... [Gilliland] intends to raise a manufacturing defect claim ... [since] such a claim would not be viable as there is no evidence that any of the Zometa infusions ... [Gilliland] received de-

parted from the design specifications for Zometa." Def.'s SJ Br. at 17 n. 4. Novartis further argues that Gilliland "cannot maintain a design claim because, *inter alia*, ... [she] lacks the necessary expert testimony to establish that there is a defect in the design of Zometa, and that removing any defect from the design would have prevented ... [Gilliland's] ONJ without compromising the benefits of Zometa." *Id.* at 17. Even a cursory review of Gilliland's Complaint, however, reveals that she intended to assert a negligent manufacture claim, not a design defect claim. *See* Compl. ¶¶ 28–33 (setting forth the elements of her claim and labeling it a negligent manufacture claim). Accordingly, the Court will treat Gilliland's claim as a negligent manufacture claim. Even assuming, however, that Gilliland raised a design defect claim in this lawsuit, Novartis would also be entitled to judgment as a matter of law on such claim because she does not resist Novartis's arguments seeking summary judgment on the design defect claim. *See generally* Pl.'s SJ Resistance Br.

quate facts disclosed to Ms. Gilliland and her health care providers"). Under Iowa law, however, "[f]ailure to warn claims cannot be brought under a theory of strict liability." *Scott v. Dutton–Lainson Co.*, 774 N.W.2d 501, 504 (Iowa 2009) (internal citation omitted). As for claims based on the remaining two types of defects, "[t]he Third Products Restatement recognizes that 'strict liability is appropriate in manufacturing defect cases, but negligence principles are more suitable for ... [design defect[26]] cases.' " *Id.* (quoting *Wright,* 652 N.W.2d at 168); *accord Huck v. Wyeth, Inc.,* No. 12–0596, 850 N.W.2d 353, 383, 2014 WL 3377071, at *26, 2014 Iowa Sup. LEXIS 80, at *74 (Iowa July 11, 2014) ("[T]he Restatement (Third) of Torts: Products Liability had, in addressing claims of design defect, abandoned the consumer-expectations test traditionally employed in strict liability analyses in favor of a risk-utility test typically found in negligence analyses." (internal citation omitted)). Thus, in light of Gilliland's assertions in this case, her strict liability cause of action can only rest on allegations of a manufacturing defect, i.e. that the Zometa infusions Gilliland received deviated from Zometa's intended design. *See id.* As noted above, however, *see supra* Section III.C, Gilliland has apparently chosen not to defend her negligent manufacture claim, thus effectively conceding that the Zometa infusions she received did not suffer from a manufacturing defect. There-

fore, pursuant to Federal Rule of Civil Procedure 56(f)(1), no later than August 1, 2014, Gilliland shall file a brief explaining why the Court should not enter summary judgment for Novartis on her strict liability claim. If Gilliland decides to abandon this claim, she shall notify the Court of such decision as soon as practicable, but in any event, no later than August 1, 2014. Failure to timely comply with this Order shall result in the entry of summary judgment—without further notice—in favor of Novartis.

### E. *Breach of Implied Warranty* [27]

▮ For reasons that follow, the present ruling does not preclude recovery by Gilliland under an implied warranty theory. Under Iowa law, claims for breach of implied warranty of fitness for a particular purpose are distinct from claims for breach of implied warranty of merchantability. *See Employers Mut. Cas. Co. v. Collins & Aikman Floor Coverings, Inc.,* No. 4:02–cv–30467, 2004 WL 840561, at *8–9, 2004 U.S. Dist. LEXIS 7192, at *23–25 (S.D.Iowa Feb. 13, 2004) (internal citations omitted). It appears that Gilliland asserts the latter type of implied warranty claim because she alleges that the Zometa infusions she received were not merchantable, i.e., fit for their ordinary purpose. *See* Compl. ¶ 48 (alleging that Zometa was not "safe for its intended use ... [and was not] of merchantable[28] quali-

---

26. Even assuming that Iowa law recognized strict liability claims based on an alleged design defect, as explained above, *see supra* n. 22, Gilliland does not resist Novartis's arguments seeking summary judgment on her design defect claim (assuming, of course, that she raised such a claim in the first place). Thus, Gilliland effectively concedes that Zometa did not suffer from a design defect.

27. Novartis's only challenge to Gilliland's breach of implied warranty claim rests on the asserted lack of specific causation evidence.

*See supra* Section III.A. The Court, however, finds that a brief analysis of this theory of recovery would benefit the litigants, insofar as it clarifies the scope of the implied warranty claim.

28. Goods are merchantable if they are "fit for the ordinary purposes for which such goods are used." Iowa Code § 554.2314(2)(c). The "ordinary purposes for which ... goods are used" refers to "uses which are customarily made of the goods in question." *Id.* § 554.2315 cmt. 2.

ty"). To prevail on such claim, Gilliland must persuade the jury that the Zometa infusions she received suffered from some defect, as defined by § 2 of the Third Products Restatement. *See Conveyor Co. v. SunSource Tech. Servs.*, 398 F.Supp.2d 992, 1004 (N.D.Iowa 2005) ("Conduct that gives rise to a warranty claim based on fitness for ordinary purposes mirrors conduct that gives rise to tort liability for a defective product. Thus, warranty liability under section 554.2314(2)(c) requires proof of a product defect as defined in [the Third] Products Restatement section 2." (quoting *Wright*, 652 N.W.2d at 182)). As noted above, however, *see supra* Section III.C, Gilliland has apparently chosen not to defend either her negligent manufacture claim or her design defect claim (assuming, of course, that she asserted such a claim), thus effectively conceding that Zometa did not suffer from any design or manufacturing defects. Accordingly, Gilliland's breach of implied warranty claim may only rest on allegations of a warning defect. *See Wright*, 652 N.W.2d at 182 (concluding that, even though the plaintiffs could not maintain a breach of implied warranty claim based on an alleged manufacturing defect, they could nevertheless seek "recovery under an implied warranty theory where the defect alleged ar[o]se[ ] from a defective design or inadequate instructions or warnings"). As the Court has already determined, *see supra* Section III.B.1, a reasonable jury could conclude that Zometa suffered from a warning defect. Therefore, Gilliland's breach of implied warranty claim remains viable.

## IV. CONCLUSION

For the foregoing reasons, Novartis's Motion to Exclude (Clerk's No. 79) is GRANTED IN PART and DENIED IN PART. In particular, Dr. Sung is precluded from opining, based on his personal observations, that "the incidence and se-

verity of [ ]ONJ is related to time on bisphosphonate," but he is allowed to testify that Gilliland's Zometa infusions caused her ONJ. Novartis's Motion for Summary Judgment (Clerk's No. 83) is also GRANTED IN PART and DENIED IN PART. Specifically, the Court grants Novartis's Motion with respect to Gilliland's negligent manufacture and breach of express warranty claims, as well as her design defect claim (assuming Gilliland asserted such claim), and denies it with regard to her negligent failure to warn and breach of implied warranty claims. The Court reserves ruling as to the propriety of entering summary judgment in favor of Novartis on Gilliland's strict liability claim until she briefs the issue or the time for doing so has expired.

IT IS SO ORDERED.